

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10007*

October 22, 2025

**BY ECF**
The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:      <u>United States v. Brandalene Horn</u>, 24 Cr. 638 (LAK)

Dear Judge Kaplan:

      The Government respectfully submits this letter in advance of the October 29, 2025 sentencing for defendant Brandalene Horn in the above-referenced matter.  The defendant faces a sentencing range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") of 18 to 24 months' imprisonment (the "Guidelines range"), after having pled guilty pursuant to a plea agreement to interstate transportation of stolen property, in violation of Title 18, United States Code, Section 2314.

      The Probation Office has recommended a below-Guidelines sentence of 366 days' imprisonment, and the defense seeks a sentence of five years' probation.  For the reasons set forth below, the Government respectfully submits that a sentence within the Guidelines range, followed by three years' supervised release, including all the special conditions recommended by the Probation Office, would be sufficient, but not greater than necessary, to serve the purposes of sentencing.

      I.      **Background and Offense Conduct**

      For a period of at least eighteen months between April 2022 through October 2023, the defendant perpetrated a large scheme to steal high-end, designer women's clothing and accessories from three subscription-based clothing rental companies and subsequently resell those stolen items for profit on the defendant's e-commerce webpage.  (Presentence Investigation Report ("PSR") ¶¶ 9, 13–15).  In total, the defendant stole approximately 1,063 items with an aggregate retail price of approximately $823,000 from the three victim companies.  (*Id*. ¶ 26.)

      The three victim companies offered subscription-based clothing rental services by which customers agreed to pay a monthly fee to rent selected clothing and accessories which were required to be returned after a set rental period. (PSR ¶¶ 10, 14.)  Customers who failed to pay the monthly fee by the billing date were required to return the rented items, and if those items were not returned, the customer was charged a fee for each item that was not returned.  (*Id*.)

Using multiple different email addresses, phone numbers, and payment methods, the defendant opened over 170 different accounts with the three victim retail companies and placed orders to rent multiple articles of luxury, designer clothing and accessories worth thousands of dollars. (PSR ¶¶ 11, 13.) Instead of returning the rented items, however, the defendant purposefully kept the merchandise, and when the victim companies attempted to charge the defendant's credit or debit card on file for the monthly subscription renewal or other related fees, these payment methods the defendant had provided were declined and could not be successfully charged. (*Id.* ¶ 14.) Oftentimes, the defendant or a person purporting to be the defendant's husband had contacted the credit or debit card company to dispute or claim as fraudulent the payments sought by the clothing rental companies, which caused the payment to be declined. (*Id.*)

As a result of these declined payments, and the defendant's failure to return the rented merchandise, the victim companies closed the defendant's clothing subscription accounts. (PSR ¶ 14.) However, the defendant simply opened new accounts in order to continue receiving designer items and to continue perpetrating her fraud scheme. (*Id.*) In May 2023, one of the victim companies sent the defendant a letter demanding the return of her stolen items and the repayment of the money she owed, but the defendant simply ignored the letter and continued with her scheme. (*Id.* ¶ 20.)

With the stolen merchandise in hand, the defendant then resold or attempted to resell the luxury items belonging to the victim companies, after she removed barcodes or labels on the tags that had been affixed by the victims and would indicate that the items had been stolen. (PSR ¶¶ 15–16.) She created listings on a resale e-commerce marketplace website, with photographs and descriptions of hundreds of items she was offering for sale. (*Id.*) Oftentimes, the photographs the defendant used on her webpage were the same exact professional photographs that the victim clothing rental companies had used on their websites to market the items themselves. (*Id.*) For one of the victim companies, the defendant stole approximately 878 items valued at over $750,000 and successfully resold 819 of those items on her own website. (*Id.* ¶ 21.)

On February 12, 2024, the defendant was charged with (1) mail fraud, in violation of Title 18, United States Code, Section 1341, (2) wire fraud, in violation of Title 18, United States Code, Section 1343, and (3) interstate transportation of stolen goods, in violation of Title 18, United States Code, Section 2314. The defendant was arrested on February 14, 2024. (PSR ¶¶ 27–28; Dkt. No. 1.) On May 15, 2025, pursuant to a plea agreement, the defendant pled guilty before a magistrate judge to interstate transportation of stolen property. (Dkt. Nos. 42, 43.) This Court accepted the plea on October 7, 2025. (Dkt. No. 51.)

Since being on pretrial release in this case, there have been multiple instances of noncompliance, requiring admonishment from the Court, including the defendant's use of cocaine, and her testing positive for cocaine, fentanyl and other illicit substances. (PSR ¶ 5.) In addition, after being advised by the Court that she must comply with the treatment programs she was ordered to attend, she was repeatedly non-compliant with mental health and substance abuse treatment, as she left her treatment facility against medical advice in November 2024 and subsequently tested positive for controlled substances such as benzodiazepines and marijuana. (*Id.*) Thereafter, this Court modified the conditions of bail to require the defendant to surrender to a residential drug treatment program. (*Id.*) Ultimately, the defendant completed the residential treatment program in February 2025, but on one subsequent occasion tested positive for Xanax without possessing a

prescription. (*Id*.) Moreover, while on pretrial release, the defendant opened lines of credit, including a bank loan for a car, in another person's name, without his permission and used his credit cards without authorization. (PSR ¶ 5, 79.)

In addition, the instant conviction is the defendant's eighth criminal conviction. Her criminal history includes a prior domestic battery conviction, for which she was sentenced on or about July 17, 2008 to a 28-day suspended prison term that required her to comply with certain conditions. (PSR ¶ 48.) Two months later, in September 2008, the defendant failed to appear at a show cause hearing to explain why the conditions of her sentence had not been met and a warrant was issued for her arrest. (*Id*.) After she was arrested on that warrant in or about April 2017, the defendant was ordered to appear at a hearing newly scheduled for in or about May 2017, but the defendant again failed to appear. A second warrant was issued for the defendant's arrest, and that warrant remains active. (*Id*.) The defendant has also had six prior driving-related offenses between approximately May 2009 to January 2018, such as for operating a motor vehicle while intoxicated or with a suspended license, or speeding, and some of which resulted in terms of imprisonment between one to five days. (*Id*. ¶¶ 49–54.) The defendant committed several of these offenses shortly after she was sentenced to the suspended prison term for her 2008 domestic battery conviction and while she had an open warrant for her arrest in connection with that case. After being arrested for at least one of these offenses, the defendant provided a false name to law enforcement and subsequently admitted to law enforcement that she provided a false name because she was pregnant and did not want to go to jail. (*Id*. ¶ 51.)

## II. Discussion

### A. Applicable Law

The United States Sentencing Guidelines still provide strong guidance to courts following *United States v. Booker*, 543 U.S. 220 (2005). Although the Guidelines are no longer mandatory, because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, the sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the defendant's need for rehabilitation; the kinds of sentences available; and the need to avoid unwarranted disparities in the sentences imposed on similarly situated defendants. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (quoting *Gall*, 552 U.S. at 46). Ultimately, the Court must impose a sentence that is sufficient, but not greater than necessary, to serve the purposes of sentencing.

3

### B. A Sentence Within the Guidelines Range is Appropriate

The Court should impose a sentence within the Guidelines range of 18 to 24 months' imprisonment, followed by three years' supervised release. Such a sentence is warranted given the nature and extent of the offense, the need to promote respect for the law and to afford adequate deterrence to criminal conduct.

The defendant's conduct was serious and extensive. Over the course of at least eighteen months, she singlehandedly engaged in a brazen fraud scheme repeatedly targeting the same businesses to steal over $800,000 worth of luxury and designer goods. The defendant's actions were deliberate and carefully planned, involving deception at every step. Her fraud was not simply a one-time or short-term lapse in judgment. She repeatedly deceived the victim companies by promising to return merchandise she had no intention of returning, and she provided payment information to the victims that she knew would not be successfully completed—because she herself called or caused her family members to call the credit card companies to falsely claim that the victims' charged payments were fraudulent.

When the defendant subsequently advertised and sold the stolen items on her e-commerce webpage for her own profit, she often stole and reposted the professional photographs of the clothing and accessories that one of the victim companies had itself developed and used to market those items on its website. The victim companies also included bar codes or other tags on their rental items to facilitate tracking, and the defendant forcibly removed those labels – which often left behind a visible discoloration or marking on the tag – in order to conceal from the defendant's customers that the clothing she was selling had been stolen. In other words, the defendant intentionally engaged in multiple forms of deception and theft against the victim companies and against her unsuspecting customers. And she was prolific. For one of the victim companies, she stole approximately 878 items and successfully resold 819 of them – over 90% of what she stole – for her own profit.

Furthermore, the defendant persisted in carrying out the scheme in the face of setbacks. Whenever the victim companies closed her account due to her theft and her declined payments, she was completely undeterred. Instead, she just opened up new accounts, using new names, email addresses, phone numbers, and in some cases, birthdates, to deceive the victims and prevent them from detecting and blocking her ongoing theft. Ultimately, she opened over 170 different accounts with three victim retail companies, with each false account reflecting the defendant's conscious choice to continue perpetrating her fraud. Indeed, even after one victim had uncovered the defendant's fraudulent conduct and sent her a letter in May 2023 to demand the immediate return of its stolen merchandise and repayment of payments owed, the defendant simply ignored the letter and continued to perpetrate her scheme. Moreover, the defendant appears to have perpetrated this crime for financial gain and reportedly used at least some of the proceeds to travel to Nevada for a romantic affair. (PSR ¶ 79.) Thus, a meaningful sentence of incarceration is needed to adequately reflect the serious nature and extent of the offense and to deter the defendant from committing future crimes.

The need for deterrence is also reflected in the defendant's history and conduct while on pretrial release in this matter. While on bail, she had extended periods during which she tested positive for drugs and struggled to comply with her mental health and substance treatment

4

obligations, resulting in court proceedings on three instances in November 2024, December 2024, and July 2025 to direct her to comply. Although the defendant currently appears to be drug free and actively managing her mental health, she has had a poor overall record of compliance while on pretrial release – including experiencing multiple relapses with respect to her substance abuse and refusing to complete treatment – which also reflects a need for deterrence. Similarly, the fact that the defendant has had seven prior convictions from between 2008 and 2018 and has had multiple warrants issued for her arrest following failures to appear for her prior criminal cases shows that she has a general disregard for the law and for others. It is also deeply troubling that even after the defendant's arrest and charges for the instant fraud offense, which involved her use of payment cards belonging to others, the defendant continued to engage in similar conduct while on pretrial release: she had opened a line of credit using someone else's name and used someone else's credit cards, all without that person's permission. The defendant's serial misconduct, even after her arrest in this case, does not provide confidence that she can be rehabilitated without a meaningful term of incarceration. And indeed, her prior, shorter terms of incarceration were insufficient to deter her from committing the instant offense.

The defendant seems to argue that the Guidelines range overstates her culpability or is somehow unjust because it incorporates the total retail value of the goods stolen from the three victim companies, *i.e.*, $823,000, instead of the actual loss, or restitution amount, of $215,008.25. However, using the $823,000 figure to calculate the defendant's Guidelines exposure is not only correct under the Guidelines, as the defendant concedes, but it is also a fair approximation of the severity of her conduct in this case, because it reflects the amount that the defendant intended to gain from her fraud, even if she ultimately chose to sell the stolen merchandise at prices lower than the retail price. Moreover, contrary to the defense's suggestion, using the $215,008.25 figure to determine the Guidelines exposure would significantly understate the extent of the loss caused by the defendant here because the $215,008.25 amount reflects the cost that the three victim companies paid for the stolen merchandise, but their true loss is much more than that amount. Because the clothing was for rental, the victim companies expected to not only recoup the costs they paid for those items, but to also make a profit. Thus, the Guidelines range for the defendant remains a fair and appropriate starting benchmark for determining her sentence.

Ultimately, nothing justifies the extraordinary leniency sought by the defendant. The nationwide JSIN data in the Presentence Investigation Report indicates that the vast majority of defendants with the same offense level and criminal history category as the defendant – an offense level of 15 under U.S.S.G. § 2B1.1 and a criminal history category of I – have received significant terms of imprisonment. While the Government recognizes the defendant's unstable childhood environment and her history of drug abuse and mental health challenges, the probationary sentence sought by the defendant falls far short of adequately accounting for the severity and repetitive nature of the instant offense, the defendant's history, and the need for deterrence, especially since serving multiple short terms of incarceration for her prior convictions in the past failed to prevent her from engaging in the instant conduct. Furthermore, there is no indication that she committed the instant offense because of any sudden change in financial circumstances, and the financial position and family circumstances she now faces are more difficult, supporting a stronger need for deterrence.

Moreover, the non-custodial sentences that the defendant cited in support of a purely probationary sentence are distinguishable from the facts here, as they involved defendants with

5

mitigating circumstances that are not present here, based on review of the Government's sentencing submissions in those cases.  For instance, Charles Briscoe and Tiquan Reese had no prior criminal convictions, and Reese had exemplary compliance with pretrial supervision.  (*United States v. Briscoe*, 23 Cr. 134 (VSB), Dkt. No. 111; *United States v. Reese*, 19 Cr. 904 (RA), Dkt. No. 45.)  Other cited defendants had less severe offense conduct.  Jose Andre Urena Sancho was only involved in the money laundering aspect of a fraud scheme, not with making material misrepresentations, and Cambria Merrill only participated in the fraud scheme for three months.  (*United States v. Urena Sancho*, 20 Cr. 102 (VEC), Dkt. No. 89; *United States v. Merrill*, 19 Cr. 695 (RD), Dkt. No. 48.)  Doran Santiago-Ramos, who received a sentence of time-served, had been incarcerated for over two years pretrial before being sentenced and thus, practically speaking, served a term of incarceration.  (*United States v. Santiago-Ramos*, 20 Cr. 4 (ER), Dkt. No. 57.)  Jon Barry Thompson was not only a perpetrator of the fraud, but also partially a victim of the other co-conspirators in the fraud, and he had health issues potentially impacted by a term of incarceration during the Covid-19 pandemic.  (*United States v. Thompson*, 19 Cr. 698 (ER), Dkt. No. 43.)  Thus, the defendant's other cited fraud sentences do not support a purely probationary sentence here.

While the defendant also claims that a probationary term would result in greater taxpayer savings than a term of incarceration. That argument does not warrant a probationary term, particularly in light of the factors described above.

Finally, the Government agrees with Probation that a fine of at least $7,500, which is at the bottom of the Guidelines range of $7,500 to $75,000, should be imposed.  Section 5E1.2(a) "requires a district court to 'impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.'" *United States v. Glick*, 142 F.3d 520, 528 (2d Cir. 1998) (citation omitted).  The defendant bears the burden of demonstrating an inability to pay a fine.  *See United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001).  The statutory factors to be considered before imposing a fine, in addition to the factors in Section 3553(a), include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the Government of any imprisonment. 18 U.S.C. § 3572(a).  These factors are relevant "only to the amount of the fine, rather than the decision *whether* to impose a fine." *United States v. Corace*, 146 F.3d 51, 56 (2d Cir. 1998).  Here, a fine is appropriate, and the defendant has not met her burden of showing that she is unable to pay a fine.  Probation has requested a financial affidavit from the defendant as well as copies of her federal tax returns for the last three years, but she has not provided any of those documents.  (PSR ¶ 115-118.)  Accordingly, Probation has indicated that the defendant "has not shown an inability to pay a fine" and recommends a fine.  (PSR at 37.)  Moreover, if the Court imposes a term of imprisonment within the Guidelines range of 18 to 24 months, a fine of $7,500 will still fall well short of the costs of imprisoning the defendant for her crimes.

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Guidelines range of 18 to 24 months' incarceration, followed by three years of supervised release.[1]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    _s/_____
Katherine Cheng / Connie Dang
Assistant United States Attorneys
Southern District of New York
Tel. 212-637-2492/ 2543

---

[1] The Government agrees with the Probation Office's recommendation that the Court impose special conditions, including mental health and substance abuse treatment conditions, a financial condition, and a search condition, due to the defendant's criminal history and the nature of the instant offense, among other factors. In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g., United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).